UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


KATHERINE CURLEY,
     Plaintiff,


     v.                                            CIVIL ACTION NO. 16-11240-IT


COMMISSIONER OF SOCIAL SECURITY,
     Defendant.


REPORT AND RECOMMENDATION
ON MOTION TO REVERSE (#15) AND
DEFENDANT'S MOTION TO AFFIRM
THE COMMISSIONER'S DECISION (#19).


KELLEY, U.S.M.J.


I. INTRODUCTION.


Plaintiff Katherine Curley seeks reversal of the decision of defendant Commissioner of

Social Security, denying her Disability Insurance Benefits (DIB) and Supplemental Security

Income (SSI) benefits. (#15.) Defendant moves for an Order affirming her[1] decision. (#19.) With

_____

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security.

the administrative record (#11) having been filed and the issues fully briefed (##15, 20, 22), the cross motions stand ready for decision.

## II. BACKGROUND.

### A. Procedural History.

Plaintiff applied for DIB and SSI on March 30, 2010, alleging a disability onset date of May 15, 2007. (TR[2] at 147, 331-37, 338-44.) The two claims were denied on June 23, 2010, and again upon reconsideration on January 31, 2011. (TR at 140, 141, 142, 143, 172-75, 176-81, 182-84,185-87.) Plaintiff requested a hearing before an administrative law judge (ALJ), which was held on October 2, 2012. (TR at 190-91.) Plaintiff's attorney and a vocational expert, James Soldner, appeared at the administrative hearing before ALJ Constance D. Carter; Curley did not appear. *Id.* ALJ Carter heard testimony from Soldner at that time. (TR at 43-8.) Another hearing was held before ALJ Carter on May 23, 2013, which was attended by Curley, her attorney, and a second vocational expert, Michael LaRaia. (TR at 52-95.) Both plaintiff and LaRaia testified. *Id.*

The ALJ issued a decision unfavorable to Curley on June 18, 2013. (TR at 144-67.) Following a request for review of hearing decision, on August 11, 2014, the Appeals Council remanded the matter to the ALJ for further consideration and development of evidence. (TR at 168-71.)

Upon remand, ALJ Carter held another hearing on December 16, 2014. (TR at 96-139.) Curley attended this hearing with her attorney and testified, as did a third vocation expert, Estelle Hutchinson. *Id.* Thereafter, on February 24, 2015, ALJ Carter issued a decision in which she found again that Curley was not disabled. (TR at 7-28.) On May 7, 2016, the Appeals Council denied

---

[2] "TR" refers to the administrative record.

plaintiff's request for review. (TR at 1-3.) As a consequence of the denial, the ALJ's decision *de facto* became the final decision of the Acting Commissioner, subject to judicial review under 42 U.S.C. § 405(g). The instant action was filed on June 24, 2016. (#1.)

B. Health Conditions.[3]

The medical records reveal that Curley has a history of lower back pain. She was referred to Angels Neurological Center, P.C. (Angels) for evaluation of her back pain in February of 2008. (TR at 544-47.) Upon physical examination, she was found to have "good range of motion demonstrated [in] all joints" with normal strength in both her upper and lower extremities, albeit with "slightly decreased strength LLE." (TR at 546, 547.) Plaintiff continued to treat at Angels for low back pain through November 2009.[4] (TR 436-550.)

In September/October of 2008, plaintiff was evaluated at Community Counseling of Bristol County, Inc. (CCBC) and diagnosed as having dysthymic disorder and general anxiety disorder. (TR at 894-95.) Her Global Assessment of Functioning (GAF) score at the time was 55,[5] and it was

[3] The recitation of medical evidence shall be limited to that which is germane to plaintiff's appeal.

[4] During office visits on February 27, 2008, March 13, 2008, March 24, 2008, April 12, 2008, November 18, 2008, March 10, 2009, May 12, 2009, May 21, 2009, June 16, 2009, August 4, 2009, August 20, 2008, and September 9, 2009, Curley was observed to have normal strength in her upper and lower extremities. (TR at 446, 454, 457, 470, 481, 487, 492, 495, 508, 518, 524, 531, 535, 541.) A slightly decreased strength was noted in the lower left extremity during visits on February 27, March 13 and March 24. (TR at 541, 535.) During office visits on February 27, 2008, March 13, 2008, August 20, 2008, and November 18, 2008, it was noted that plaintiff had good range of motion in all joints. (TR at 517, 523, 544, 546.)

[5] A Global Assessment of Functioning score rates a person's overall level of functioning. *See* Am. Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text revision 2000) (DSM-IV). A GAF score of 51-65 is indicative of moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *DSM-IV*. The Fifth edition of the *Diagnostic and Statistical Manual of Mental Disorders* (2013) (*DSM-V*) drops the use of GAF scores "for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." *DSM-V* at 16. "However, the Social Security

observed that she "has historically been inconsistent in meeting the schedule of her own therapeutic" treatment. (TR at 895.) In a June 29, 2009 record from CCBC, the doctor wrote that Curley canceled her appointment thirty minutes before it was scheduled, and that her record reflected "significant non-compliance" both with her medications and her therapy appointments. (TR at 874.)

On October 13, 2008 Curley was seen at the Emergency Room of Brockton Hospital for lower left back and leg pain. (TR at 558.) She was discharged with a diagnosis of sciatica. (TR at 559.) Curley was back in the Emergency Room five days later when she was diagnosed with chronic back pain.[6] (TR at 571-72.) Plaintiff returned to the Emergency Room with back pain the following day, October 19, 2008; she was treated for acute sciatica and released. (TR at 561-62.)

The records from Habit Opco Inc. indicate that on January 25, 2009, plaintiff self-referred because she was experiencing withdrawal symptoms and abusing opiates. (TR at 899.) Her initial diagnosis was opioid dependency and mood disorder; her GAF was 40.[7] (TR at 903.)

---

Administration . . . has indicated that it will continue to receive into evidence and consider GAF scores. Further, courts have not disavowed the GAF scale as a measurement of one's mental capacity: Although ALJs cannot draw reliable inferences from the difference in GAF ratings assigned by different clinicians or from a single GAF score in isolation, they can continue to consider GAF scores just as [they] would other opinion evidence, [although] scores must have supporting evidence to be given significant weight." *Lopez-Lopez v. Colvin*, 138 F. Supp. 3d 96, 111 (D. Mass.), *on reconsideration in part,* 144 F. Supp. 3d 260 (D. Mass. 2015) (internal citations and quotation marks omitted).

[6] Nurses' notes indicated that Curley was sitting in a chair in the Emergency Room waiting area with her left leg crossed over her right knee, twisting to the right and looking over her shoulder with her legs crossed. (TR at 572.) She was seen as resting comfortably in the waiting room, and she walked to the examination room with a steady gait. *Id.*

[7] A GAF score of 31-40 is indicative of "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood (e.g., depressed man avoids friends, neglects family, is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *DSM-IV* at 32.

On January 30, 2009, Curley fell and was treated in the Brockton Hospital Emergency Room for back pain. (TR at 564.) She was diagnosed with sciatica and lumbar contusion. (TR at 569.)

Curley was seen in the Emergency Room at Caritas Good Samaritan Medical Center on August 2, 2009, following a motor vehicle accident; she was complaining neck pain, pain in both shoulders and both legs. (TR at 716.) A CT scan revealed "straightening of the cervical spine and degenerative joint disease . . . mainly at C6-C7 with disk bulging, disc narrowing and spurring both anteriorly and posteriorly." *Id.*

At a post-accident office visit at Angels on August 4, 2009, plaintiff complained of back and neck pain and was referred for an MRI of her cervical spine; otherwise, her examination was normal. (TR at 485-88.) Two weeks later Curley was seen complaining of neck pain and right arm numbness for about fifty percent of the day. (TR at 483.) At an office visit on September 9, 2009, plaintiff's neck pain was noted to have been exacerbated by her car accident, and she had some arm, neck and hand numbness on the right side. (TR at 479.) In a motor exam, her gait and strength in the upper and lower extremities were found to be normal; in a sensory exam, she had normal sensation to pin prick and normal vibratory sensation in the upper and lower extremities. (TR at 481.) The doctor discussed lowering the dosage of opioids plaintiff was taking. (TR at 482.)

In an annual outpatient adult comprehensive assessment update at CCBC in October 2009,[8] it was noted that Curley reported struggling with symptoms of anxiety and depression which were "exacerbated by various family and financial issues." (TR at 575.) The record reflects that plaintiff

_____

[8] This record is dated 10/15/2100, but that is plainly an error.

5

had no history of substance or alcohol use/abuse, and had previously been diagnosed with ADD, OCD and anxiety/depression. *Id*. She was then diagnosed with dysthymic disorder. (TR at 576.)

On November 10, 2009, Curley had an office visit with Dr. Eneyni at Angels after having missed many appointments. (TR at 478.) She complained of pain in the neck region mostly in the morning, as well as stiffness in her neck, difficulty moving her neck to one side and numbness in her right hand. *Id.* The general and neurological exams were normal; the impression was neck pain. (TR at 437.) Dr. Eneyni determined that Curley was "not a candidate for opioids," and opined that she had "been very noncompliant." *Id*.

On January 27, 2010 plaintiff sought treatment at the Caritas Good Samaritan Medical Center for migraine headache. (TR at 701.) The attending physician noted that Curley had been seen in the Emergency Room three times in the last three to four weeks for headaches or back pain. *Id*. The doctor related a severe concern "that there is an opiate dependency and there has been significant drug-seeking behavior" with multiple inconsistencies in the stories plaintiff told concerning purported theft of her medications. *Id.* The diagnoses were headaches, opiate dependency and drug-seeking behavior. *Id.*

CCBC records for February 10, 2010 reflect that Curley reported anxiety and panic attacks arising from problems with her daughter. (TR at 595.) Her clinician noted that although plaintiff had never been diagnosed or treated for ADD/ADHD, "all the evidence is present that she had this disorder;" her diagnosis was ADHD, rule out PTSD. (TR at 595-96.) Curley's GAF was 60. (TR at 597.) Plaintiff reported feeling better at her CCBC appointment on March 8, 2010, but that her anxiety was increased from dealing with her daughter. (TR at 585.) Her diagnosis was again ADHD, PTSD and depression not otherwise specified. *Id.*

6

Included in the records from CCBC (TR at 642-98) is a notation on May 21, 2010 that plaintiff had missed fourteen or fifteen appointments and that there were inconsistencies in her disclosures from session to session. (TR at 688.) On June 28, 2010, Curley was "late again" for her appointment; plaintiff's "selective reporting" and lack of compliance were topics of discussion. (TR at 664.) Plaintiff's medications were adjusted, and her diagnosis was chronic pain, ADHD, PTSD and depression not otherwise specified. *Id.* Curley continued to miss CCBC therapy appointments in June and July of 2010. (TR at 655-63.) A July 20, 2010 progress note described plaintiff's "[c]ontinued issues of attendance, promptness, notification, poor time mgt., selective reporting, and overall inconsistencies in information" that had occurred over the past year. (TR at 652.) Curley was afforded a final opportunity to resume treatment by following CCBC guidelines (TR at 653), and she then missed her next appointment. (TR at 648.) CCBC personnel agreed that termination of her treatment was appropriate. *Id.* Two days later plaintiff's last urine test came back positive for sixteen drugs, with OxyContin being highlighted as significant. (TR at 647.) Based on this information, Curley's prescription for Ativan and Adderall were retracted and no further prescriptions were to be written for her. *Id.* By letter dated August 3, 2010, CCBC terminated her counseling and medication management. (TR at 646.)

In May and June of 2011, plaintiff underwent an initial adult behavioral psychosocial evaluation at CCBC. (TR at 770.) Her diagnosis was mood disorder not otherwise specified, opioid dependence, alcohol abuse and PTSD. (TR at 777.) Her GAF score was listed as 42.[9] *Id.* Curley was accepted into a CCBC treatment program, but records for the period of May through September

---

[9] A GAF score of 41-50 is indicative of serious symptoms like suicidal ideation, or any serious impairment in social, occupational, or school functioning, such as having no friends or being unable to keep a job. *DSM-IV* at 32.

of 2010 reflect that she failed to meet any of her goals because she did not attend the program as scheduled. (TR at 782-87.) Records from October and November of 2011 indicate that plaintiff continued to have attendance problems, that she was noncompliant with her treatment plan, and that she was disruptive during group therapy sessions. (TR at 791, 793, 797, 799.)

On August 3, 2011, John R. Stahl, Ph.D., conducted a psychological and neuropsychological evaluation of plaintiff. (TR at 994-1005.) Dr. Stahl assessed Curley as having mood disorder and ADHD by history, under treatment. (TR at 1004.) He assigned a GAF score of 60. *Id.*

Between January and March of 2012, plaintiff received treatment for opiate dependency, mood disorder and PTSD at High Point Treatment Center. (TR at 933-35.)

At a May 24, 2012 appointment at Morton Hospital, Curley "report[ed] arthralgias/joint pain, but . . . no muscle aches, muscle weakness, no back pain, and no swelling in the extremities." (TR at 972.) Plaintiff's physical examination revealed normal strength and tone in her musculature and normal movement of all extremities. *Id.*

Plaintiff arrived at the Emergency Room at Morton Hospital on October 10, 2012, seeking hospitalization for heroin and cocaine detoxification as well as a history of anxiety/PTSD. (TR at 1011.) Upon examination she was found to have normal range of motion and no signs of injury to her extremities. (TR at 1013.) On April 13, 2013, during a visit to the Emergency Room at Morton Hospital, Curley's neck was noted to be normal and supple on inspection, and no motor or sensory deficit was found. (TR at 1039.)

On January 19, 2013, plaintiff was admitted to Arbour-Fuller Hospital for treatment of generalized anxiety disorder, depressive disorder not otherwise specified and opiate dependency.

(TR at 1120.) Her GAF score was 30. *Id*. She was discharged on January 24, 2013; her GAF score was 50. (TR at 1118)

CCBC records show that Curley was treated in January and February of 2013 for obsessive-compulsive disorder; major depressive disorder, recurrent, moderate; attention deficit/hyperactivity disorder, combined type; and opioid abuse. (TR at 989-993.) Her GAF score on February 22, 2013 was 55. (TR at 989.)

Plaintiff was examined for disability purposes by Darrolyn McCarroll, M.D., on September 16, 2013. (TR at 1179-81.) Curley complained primarily of early morning stiffness and pain in her large joints and the small joints in her hands; back pain; hypothyroidism; and irritable bowel syndrome. (TR at 1180.) It was noted that while normal on the left, straight leg raising "on the right supine was . . . severely limited, and the patient complained of pain and on the right seated was . . . severely limited and the patient complained of pain." (TR at 1180-81.) Dr. McCarroll found the "cervical spine, flexion, extension, right and left lateral flexion, right and left rotation were normal." (TR at 1181.)

On November 21, 2013 Nicole A. Evans, M.Ed., conducted a comprehensive assessment of Curley. (TR at 1121-25.) Plaintiff was determined to be oriented to time, place and person, she was able to concentrate and her memory function, judgment and insight were intact. (TR at 1124.) Her Axis I diagnosis was generalized anxiety disorder and PTSD; her Axis II diagnosis was personality disorder not otherwise specified. *Id.* Curley's GAF score was 55. *Id.*

Mental health records from Ileana Berman, M.D., date from September 2013 through October 2014. (TR 1126-42.) On September 24, 2014, Dr. Berman described plaintiff's thought process as organized, but found her attention and concentration to be scattered and unfocused; she

9

was better on medication. (TR at 1127.) Her memory was normal and her insight/judgment was "better." *Id*. Dr. Berman related that Curley had moved recently, and that she had been clean and sober and was looking for a job. *Id*. On October 22, 2014 plaintiff reported to Dr. Berman that she was going to stay home with her daughter's baby for now and that she was doing better. (TR at 1126.) Curley stated that she wanted to go to school to learn PowerPoint and Excel, and that she would get a certificate in Microsoft Office. *Id.*

## C. Additional Medical Opinions.

### 1. Dr. Tenenbaum.

Simon Tenenbaum, M.D., conducted a disability examination of Curley on April 13, 2006 due to complaints of neck and low back pain. (TR at 931-32.) By history, plaintiff hurt her neck in a motor vehicle accident in April of 2005; the pain was said to radiate to the left trapezius down the left arm to her hand. (TR at 931.) Curley had pain in her neck three to four days per week, and it lasted all day. *Id*. She also suffered dull, aching low back pain intermittently throughout the day. *Id.*

Upon examination, plaintiff had no edema or cyanosis in her extremities. *Id*. She is right-handed, and the grip on the right is slightly bigger and stronger than the left, although they were "almost equal," both being around a 5 out of 10. *Id.* Curley was able to turn her head 80 degrees to the right and the left. (TR at 932.)

### 2. Dr. Fitzpatrick.

On June 10, 2010, Lisa Fitzpatrick, Psy.D., conducted a Psychiatric Review Technique on Curley covering the period from May 15, 2007 through March 21, 2010. (TR at 616-29.) Her medical dispositions were based on affective and anxiety-related disorders. (TR at 616.) Curley was

found to have mild restriction in activities of daily living and difficulties in maintaining social functioning; moderate limitation with difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (TR at 626.) It was noted that plaintiff had been in counseling at CCBC for dysthymic disorder and increased anxiety/depression consequent to "chaotic family stressors" since 2007. (TR at 628.) Recent evidence indicated that Curley's mood and anxiety had improved. *Id*. Dr. Fitzpatrick opined that plaintiff's impairment did not meet or equal any listing. *Id*.

3. Dr. Jao.

On June 15, 2010, medical consultant John Jao, M.D., completed a Physical Residual Functional Capacity Assessment on Curley. (TR at 634-41.) Regarding exertional limitations, Dr. Jao found that plaintiff could occasionally lift and/or carry 20 pounds; could frequently lift and/or carry 10 pounds; could stand and/or walk about 6 hours in an 8-hour workday; could sit for about 6 hours in an 8-hour workday; and was unlimited in pushing and/or pulling. (TR at 635.) With respect to postural limitations, plaintiff was found to be able occasionally to climb, balance, stoop, kneel, crouch and crawl. (TR at 636.) Curley was determined to be limited in her ability to reach in all directions, specifically, "occasional for overhead activities bilaterally."[10] (TR at 637.) Plaintiff was found to have no limitations in handling, fingering, and feeling; Dr. Jao found no visual, communicative or environmental limitations. (TR at 637-38.)

---

[10] The assessment form inquires "how and why the evidence supports" the doctor's limitation as well as citation to "the specific facts upon which" the doctor's determination is based. (TR at 637.) Dr. Jao provided no basis for his conclusion. *Id.*

4. Dr. Madden.

On December 16, 2010, Patrick J. Madden, M.D. completed a Massachusetts Department of Transitional Assistance EAEDC[11] Medical Report with respect to Curley. (TR at 920-29.) At the time, plaintiff complained of severe pain in her lower back, pinched nerves in her neck area and a history of sciatica radiculopathy down her lower right side. (TR at 922.) Several hospital visits or stays were noted for degenerative disk disease because Curley was said to be unable to walk without falling down. *Id.* She was referred to a neurosurgeon. *Id.* Her condition was listed as chronic, but it was unclear if improvement was to be expected. (TR at 923.) Plaintiff was to continue with her medication regimen until further instructed. (TR at 924.)

Regarding mental health, Curley's then-current clinical signs and symptoms were panic attacks, ADHD, moderate to severe OCD attacks and phobia with crowded places. (TR at 925.) Dr. Madden opined that plaintiff could not "work efficiently due to physical restraints lifting, bending. [She] suffers from degenerative joint disease (DJD). Also suffers from severe stress migraines. Cannot work until further notice from neurologist." (TR at 928.) The doctor concluded that Curley had a physical, mental health or cognitive impairment(s) affecting her ability to work and that the impairments(s) is expected to last more than a year. (TR at 929.)

5. Dr. Dartrau.[12]

On June 30, 3011, Dr. Dartrau completed a Massachusetts Department of Transitional Assistance EAEDC Medical Report with respect to Curley. (TR at 910-919.) Plaintiff complained

---

[11] The acronym stands for Emergency Assistance to Elderly, Disabled and Children.

[12] The signature is difficult to decipher, so it is unclear if this is the correct spelling of the doctor's name.

of degenerative disk disease and pinched nerves in her neck. (TR at 913.) In the musculoskeletal examination where range of motion of affected joints was to be listed, the doctor wrote only that the range of motion in plaintiff's right leg was impaired. (TR at 914.) Regarding her neurological system, Dr. Dartrau noted that Curley "seems scared of surgery;" her condition was chronic and not expected to improve unless surgery was performed. *Id.*

With respect to plaintiff's mental health, her clinical signs and symptoms were listed as insomnia, crying, PTSD flashbacks, shaking a lot and nervousness. (TR at 916.) Her diagnosis was depression/PTSD/OCD. (TR at 917.) The doctor opined that Curley had a physical, mental health or cognitive impairment(s) affecting her ability to work and which was expected to last more than a year. (TR at 919.)

6. Doctor/Psychiatrists.

A Medical Source Statement of Ability to Do Work-Related Activities (Mental) was completed by an unknown MD/Psychiatrist[13] on May 9, 2013. (TR at 1054-55.) The doctor checked seventeen of the twenty work-related qualities identified as being markedly limited or effectively preclude by Curley's symptoms. *Id.* There was a caveat, however, with the doctor writing:

> Information based on client's report, as she has frequently missed appointments, stating she could not make it or would be late. Therapist has met with client 4 times and psychiatrist 1 time. Current diagnoses are obsessive-compulsive disorder, major depression and a history of opiate abuse. Clinician is unable to diagnose ADHD at this time. Client states she is always cleaning and washing things, and is afraid of public places due to germs. She is also unable to maintain a schedule of appointments or be punctual.

*Id.*

---

[13] The Physician/Psychologist's signature is illegible and the source of the record is not identified in the court transcript index.

7. Dr. Berman.

Dr. Ileana Berman, plaintiff's treating psychotherapist, completed a Mental Residual Functional Capacity Questionnaire on October 1, 2014. (TR at 1182-86.) Dr. Berman saw plaintiff weekly for a group session, treating her for "opioid / severe depression / anxiety / obsessive compulsive / ADD / PTSD." (TR at 1182.) Curley's assigned GAF at the time was 50, and her prognosis was fair. *Id.* Dr. Berman found plaintiff to have a myriad of symptoms, from generalized persistent anxiety to autonomic hyperactivity. (TR at 1183.) According to Dr. Berman, Curley was unable to meet competitive standards in all but one area because "attention deficit makes it extremely difficult for people to do simple tasks; needs constant redirecting." (TR at 1184.) According to the doctor, plaintiff was seriously limited but not precluded from understanding, remembering and carrying out detailed instructions because she "needs constant reminding & redirecting; forgets simple tasks; [and] has severe anxiety under pressure." (TR at 1185.) Similarly, Curley was unable to meet competitive standards with regard to using public transportation, and she was seriously limited, but not precluded from interacting appropriately with the general public, maintaining socially appropriate behavior, adhering to basic standards of neatness/cleanliness and travelling in unfamiliar places because she "has extreme PTSD; does not like to be in or around people she doesn't know or is familiar with; scared of getting germs from people and in the air." *Id.* Dr. Berman opined that Curley's impairments and treatment would cause her to be absent from work more than four days per month. (TR at 1186.)

D. Plaintiff's Hearing Testimony.

At the December 2014 hearing, Curley testified that she was then forty years of age, single and had obtained a GED. (TR at 100-01, 104.) She had worked primarily as a hair stylist, but had

also been employed as an aesthetician and an office worker. (TR at 101.) Plaintiff had been supporting herself on state disability benefits, food stamps, Section 8 housing and, when her children were younger, child support payments.[14] (TR at 103.) Curley lived with her daughter and her seven-month-old grandson. (TR at 104.)

Plaintiff had been looking for a job before her grandson was born, but her hair dressing license had expired and she did not have the funds to get it renewed. (TR at 107.) She had considered going back to school, but instead was caring for her grandson[15] during the day so her daughter could further her education. (TR at 105, 107.) Curley no longer had a driver's license; she depended on family members to drive her to medical appointments and other errands. (TR at 106.)

For the three and a half years before her grandson was born, plaintiff had been very depressed over losing custody of her son. (TR at 108.) She testified that everything had been a struggle and really hard. (TR at 108-09.) Curley had trouble with drug abuse in the past and was taking Suboxone. (TR at 109.) She claimed she had not had any issues with drugs in the prior three months following a short-lived cocaine relapse. *Id.* Plaintiff described her physical problems as being with her left knee, left arm, back and neck. (TR at 111.) She had difficulty climbing stairs and standing on her feet for lengthy periods of time. (TR at 112-13.) She suffered numbness in her left arm (TR at 124), but she is right-handed. (TR at 125.) She took medication for her physical pain. (TR at 121.)

---

[14] At the time of the hearing, Curley no longer had custody of her youngest child. (TR at 104.)

[15] Curley testified that her grandson weighed eighteen pounds, and that she was able to care for him, including changing his diapers and things of that sort, on her own. (TR at 126.)

Curley explained that she also had issues with obsessive compulsive disorder, worrying about germs, constantly washing her hands, and checking, then rechecking, things. (TR at 114, 116-17.) She had difficulty interacting with people and focusing on tasks, although she was doing well on Adderall. (TR at 115-16.) Plaintiff also experienced panic attacks. (TR at 125.)

## III. THE STANDARD OF REVIEW.

Title 42 U.S.C. § 405(g) provides, in relevant part:

> Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow . . . . The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .

The court's role in reviewing a decision of the Commissioner under this statute is circumscribed:

> We must uphold a denial of social security disability benefits unless 'the Secretary has committed a legal or factual error in evaluating a particular claim.' *Sullivan v. Hudson*, 490 U.S. 877, 885, 109 S. Ct. 2248, 2254, 104 L. Ed. 2d 941 (1989). The Secretary's findings of fact are conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g); *see also Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971).

*Manso-Pizarro v. Secretary of Health & Human Servs.,* 76 F.3d 15, 16 (1st Cir. 1996); *see Libby v. Astrue*, 473 Fed. Appx. 8, 8 (1st Cir. 2012); *Reyes Robles v. Finch*, 409 F.2d 84, 86 (1st Cir. 1969) ("And as to the scope of court review, 'substantial evidence' is a stringent limitation").

The Supreme Court has defined "substantial evidence" to mean "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co.*

16

*v. NLRB*, 305 U.S. 197, 229 (1938)); *see Irlanda Ortiz v. Secretary of Health & Human Servs.*, 955

F.2d 765, 769 (1st Cir. 1991). As the First Circuit explained:

> In reviewing the record for substantial evidence, we are to keep in mind that 'issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Secretary.' The Secretary may (and, under his regulations, must) take medical evidence. But the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for him, not for the doctors or for the courts. We must uphold the Secretary's findings in this case if a reasonable mind, reviewing the record as a whole, could accept it as adequate to support his conclusion.

*Lizotte v. Secretary of Health & Human Servs.*, 654 F.2d 127, 128 (1st Cir. 1981) (quoting

*Rodriguez v. Secretary of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981)); *Charkowski*

*v. Berryhill*, Civil Action No. 15-13356-GAO, 2017 WL 1080910, at *1 (D. Mass. Mar. 22, 2017).

In other words, if supported by substantial evidence, the Commissioner's decision must be upheld

even if the evidence could also arguably admit to a different interpretation and result. *See Ward v.*

*Commissioner of Social Sec.*, 211 F.3d 652, 655 (1st Cir. 2000); *Nguyen v. Chater*, 172 F.3d 31, 35

(1st Cir. 1999) (per curiam); *Torres-Martinez v. Colvin*, Civil Action No. 3:16-cv-30016-KAR,

2017 WL 1075072, at 5 (D. Mass. Mar. 21, 2017).  Finally, "[e]ven in the presence of substantial

evidence, however, the Court may review conclusions of law and invalidate findings of fact that

are derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."

*Malone v. Colvin*, - F. Supp. 3d -, 2017 WL 740990, at 9 (D. Mass. Feb. 24, 2017) (internal

quotation marks and citations omitted).

## IV. DISCUSSION.

To qualify for DBI or SSI benefits, a claimant must prove that he/she is unable "to engage

in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last

for a continuous period of not less than 12 months." Title 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). In this case, the ALJ conducted the familiar five step evaluation process used to determine whether an adult is disabled. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Goodermote v. Secretary of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982); *Torres-Martinez,* 2017 WL 1075072, at *4. ALJ Carter concluded that: 1) Curley has not engaged in substantial gainful activity since May 15, 2007, the alleged onset date; 2) Curley has severe impairments, to wit, degenerative disc disease of the cervical and lumbar spine, mood disorder, anxiety disorder, attention deficit hyperactive disorder, obsessive compulsive disorder, and drug and alcohol abuse; 3) Curley does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; 4) Curley retains the residual functional capacity (RFC) to perform light work except that she is limited to climbing, balancing, stooping, kneeling, and crouching no more than occasionally, and she can never crawl, or climb ladders; she is limited to the performance of simple 3- and 4-step tasks; she can tolerate occasional decision making and occasional changes in the work setting; she can have occasional interaction with the public, and her work can be around coworkers but with only occasional interaction with those coworkers; 5) Curley is unable to perform any past relevant work; 6) considering Curley's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that she can perform; and 7) Curley has not been under disability from May 15, 2007, through February 24, 2015, the date of the ALJ's decision. (TR at 10-22.)

Plaintiff's primary challenge to the ALJ's decision is the manner in which ALJ Carter handled the various medical opinions.

## A. Treatment of Medical Opinions.

Opinion testimony of a treating physician must be given controlling weight if it is well-supported and not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); *see also Santana v. Colvin*, No. 15-CV-13232-IT, 2016 WL 7428223, at *3 (D. Mass. Dec. 23, 2016); *Clayton v. Astrue*, No. 09–10261–DPW, 2010 WL 723780, at *6 (D. Mass. Feb.16, 2010) (applying the consistency standards of 20 C.F.R. § 404.1527(d)(2)). This means that while there is a general presumption of deference to a treating physician's opinion, the ALJ can choose not to afford the opinion controlling weight if that opinion is inconsistent with other substantial evidence in the record. *Green v. Astrue*, 588 F. Supp. 2d 147, 154 (D. Mass. 2008). Decisions regarding inconsistencies between a treating physician's opinion and other evidence in the record are for the ALJ, and not the Court, to resolve. *Costa v. Astrue*, 565 F. Supp. 2d 265, 271 (D. Mass. 2008) (citing *Rodriguez v. Sec'y of Health and Human Servs.*, 647 F.2d 218, 222 (1st Cir.1981)); *Abubakar v. Astrue*, No. 11-cv-10456, 2012 WL 957623, at *8 (D. Mass. Mar. 21, 2012).

That being said, if an ALJ determines that the treating physician's opinion is not controlling,

> the treating opinion must still be evaluated against six criteria in order to fulfill the mandate that the ALJ 'always give good reasons' when determining the weight a treating opinion deserves. 20 C.F.R. § 404.1527; [*Hagan v. Colvin*, 52 F. Supp. 3d 167, 174 (D. Mass. 2014)]. These six criteria include the length and frequency of the treatment relationship; the nature and extent of the treatment relationship; the amount of evidence offered in support of the treating relationship's opinion; the treating opinion's consistency with the overall record; the treating source's specialization; and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c).

*Santana*, 2016 WL 7428223, at *3.

1. Rejection of Dr. Jao's Opinion.

John Jao, M.D., is a non-examining medical consultant who completed a Physical Residual Functional Capacity Assessment on June 15, 2010. (TR at 634-41.) The ALJ afforded varying weight to different portions of Dr. Jao's opinion. Curley complains that the ALJ gave "less weight" to Dr. Jao's finding that plaintiff was limited to occasional overhead activities bilaterally. (TR at 637.) The ALJ discounted the opinion regarding a limitation on overhead reaching because she found no evidence in the record to support it and, to the contrary, all "physical examinations indicated that her ability to reach was intact." (TR at 19.) The ALJ did not cite to any specific medical records or part of the administrative record that supported her conclusions regarding medical examinations.

While Curley argues that Dr. Jao's limitation on overhead activities bilaterally stands uncontradicted, a review of the medical records both before and after Dr. Jao's report refutes that contention. In an evaluation done on December 30, 2008, a doctor at Angels found plaintiff to have had "good range of motion demonstrated [in] all joints." (TR at 474.) Dr. Jao's report was completed on June 15, 2010. (TR at 641.) At Morton Hospital on May 24, 2012, it was observed that plaintiff had "normal movement of all extremities." (TR at 972.) At Morton Hospital on September 1, 2012, Curley was found to have "Normal ROM." (TR at 950.) On October 8, 2012, while Curley reported to the Emergency Room at Morton Hospital that she was having back and neck pain, it was noted in the record that Curley had full range of motion in her extremities. (TR at 1008.) Again on October 10, 2012, plaintiff was found to have "Normal ROM." (TR at 1013.) In his September 2013 report, Dr. McCarroll stated that his "[e]xamination of the cervical spine, flexion, extension, right and left lateral flexion, right and left rotation were normal." (TR at 1181.)

Curley has pointed to no medical report or evidence supporting Dr. Jao's limitation. On the other hand, there was substantial evidence in the record to support the ALJ's decision to discount Dr. Jao's opinion in regard to plaintiff's overhead activities.

2. Ignoring Dr. Tenenbaum's Opinion.

On April 13, 2006, Simon Tenenbaum, M.D., conducted a physical examination of plaintiff and prepared a report for Disability Evaluation Services in connection with Curley's application for state benefits. (TR at 931-32.) Dr. Tenebaum found that her hand grips were "around 5 out of 10," (TR at 931), that she has "pain radiat[ing] to the left trapezius and down the left arm all the way down to the hand," *id.*, and that it was "the superior part of the trapezius that hurts." *Id.* The ALJ did not reference Dr. Tenenbaum's opinion in her decision and this failure, in plaintiff's view, was error. However, that a medical report was not mentioned or discussed does not mean that it was not considered. Indeed, the ALJ wrote that she had carefully considered "the entire record," (TR at 15), and that she had "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-6p and 06-3p." *Id.* Moreover, there is nothing in this rather unremarkable report that would necessarily warrant particularized mention.

Dr. Tenenbaum's report was written in broad strokes; it is, as Curley admits, "not as detailed as one might hope and he failed to give specific limitations." (#15 at 7.) Nevertheless, plaintiff argues that the doctor "noted back pain which could reasonably be expected to be aggravated by shoulder movements, especially to the extent required to reach overhead." *Id.* According to Curley, this finding supports Dr. Jao's limitations on overhead activities. The difficulty here is that plaintiff is attempting to extrapolate a discrete medical finding from a general observation. Dr. Tenebaum did not relate plaintiff's back pain to a limitation on shoulder movement. In fact, he stated nothing

about Curley's range of motion in her upper extremities, or the extent of her ability to reach overhead in his report. Whether the back pain described by Dr. Tenebaum would somehow be exacerbated by shoulder movement falls outside the ken of a lay person.

3. Adopting Dr. Fitzpatrick's Opinion.

ALJ Carter gave "great weight" to the June 2010 opinion of Dr. Fitzpatrick. Curley challenges the ALJ's reliance on Dr. Fitzpatrick's assessment, arguing that the opinion was rendered nearly five years before the ALJ's decision was issued and so, in fact, was stale.

An ALJ may rely on reports from non-treating physicians when they are more consistent with the record than reports provided by treating physicians. *See Berrios–Lopez v. Sec'y of Health & Human Servs.*, 951 F.2d 427, 431 (1st Cir.1991); *Crossley v. Colvin*, No. 13-cv-11427, 2015 WL 4512643, at *4 (D. Mass. July 24, 2015) ("The ALJ may rely on the opinions of non-examining sources to determine a claimant's RFC and need not to give greater weight to the opinions of treating physicians") (citing *Arroyo v. Sec'y of Health & Human Servs.*, 932 F.2d 82, 89 (1st Cir. 1991)). That being said, medical evidence that is too far removed from the relevant time period cannot constitute substantial evidence if more recent records establish a significant worsening of the claimant's condition. *See Abubakar v. Astrue*, No. 11–cv–10456–DJC, 2012 WL 957623, at *12 (D. Mass. Mar. 21, 2012), and cases cited. The ALJ may rely on the older evidence where it remains consistent with the current condition. *Id.*; *Ferland v. Astrue*, No. 11–cv–123–SM, 2011 WL 5199989, at *4 (D.N.H. Oct. 31, 2011); *Nelson v. Colvin*, No. 14-cv-10254, 2015 WL 1387864, at *12 (D. Mass. Mar. 25, 2015).

Here, it is undisputed that Dr. Fitzpatrick did not consider any medical evidence that post-dated her psychiatric review and mental residual functional capacity assessment. As examples of

this more recent medical evidence, in September of 2014, Dr. Berman characterized plaintiff's thought process as organized, but found her attention and concentration to be scattered and unfocused. (TR at 1127.) In October of 2014, Dr. Berman opined that Curley was unable to meet competitive standards in all but one area because "attention deficit makes it extremely difficult for people to do simple tasks; needs constant redirecting." (TR at 1184.) The ALJ accorded Dr. Berman's opinion little weight, but as noted below, the treatment of that opinion must be revisited. In these circumstances, whether the ALJ could properly have relied on older evidence is open to question.

Plaintiff's more salient argument is that Dr. Fitzpatrick's opinion did not address two mental conditions, ADHD and obsessive-compulsive disorder, that the ALJ found to be severe. (TR at 13.) The regulations define a "severe impairment" to be "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 §§ 404.1520(c), 416.920(c); *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003). Thus, by definition, plaintiff's ADHD and obsessive-compulsive disorder each must significantly limit her ability to perform basic work activities. The ALJ gave little weight to the opinions of Curley's treating physicians and instead relied on Dr. Fitzpatrick's opinion in formulating plaintiff's RFC, yet Dr. Fitzpatrick offered no assessment of how ADHD or obsessive-compulsive disorder would limit Curley's ability to work.[16] As a result, Dr. Fitzpatrick's mental residual functional capacity assessment cannot constitute substantial evidence in support of the ALJ's RFC vis-à-vis plaintiff's

---

[16] The acting Commissioner asserts that there were references to these two conditions in the medical records examined by Dr. Fitzpatrick. (#20 at 14.) While this may be so, the doctor still offered no opinion on the manner in which these two conditions would "significantly limit[]" Curley's "physical or mental ability to do basic work activities."

ADHD and obsessive-compulsive disorder. Absent expert evidence, the ALJ could not evaluate the implications of these severe impairments.

Curley's severe impairments of ADHD and obsessive compulsive disorder were not adequately considered by the ALJ in formulating her RFC. For this reason, in addition to the reason set forth below, this case should be remanded.

4. Rejecting Dr. Berman's Opinion.

Dr. Ileana Berman was Curley's treating therapist who met with her weekly. (TR at 1182.) Plaintiff was being treated for opioids, severe depression, anxiety, obsessive compulsive, ADD and PTSD. *Id.* Dr. Berman opined that her prognosis was fair and ongoing. *Id.* When completing a medical residual functional capacity questionnaire, Dr. Berman identified Curley as having a myriad of signs and symptoms: pervasive loss of interest in almost all activities; appetite disturbance with weight change; decreased energy; thoughts of suicide; feelings of guilt; impairment of impulse control; generalized persistent anxiety; mood disturbance; difficulty thinking or concentrating; pathological dependence; persistent disturbances of mood or affect; paranoid thinking; recurrent obsessions or compulsions; substance dependence; bipolar syndrome; intense and unstable interpersonal relationships and impulsive and damaging behavior; disorientation to time and place; perceptual or thinking disturbances; hyperactivity; emotional lability; flight of ideas; manic syndrome; inflated self-esteem; unrealistic interpretation of physical signs or sensations; illogical thinking; pathologically inappropriate suspiciousness; easy distractability; autonomic hyperactivity; memory impairment; sleep disturbance; recurrent severe panic attacks; a history of multiple physical symptoms (for which there are no organic findings)

that have caused her to take medicine frequently, see a physician often and alter life patterns significantly. (TR at 1182-86.)

The ALJ concluded that Dr. Berman's opinion was not supported by the weight of the evidence in the record, and so accorded it little weight. The ALJ's reasoning, in its entirety, was as follows: "The claimant's activities of daily living, including her ability to care for her young grandson, as well as her positive response to conservative treatment, indicate that the claimant's limitations are not as severe as Dr. Berman has opined. For this reason, I find that this opinion is inconsistent with the evidence, and give it little weight." (TR at 20.)

SSR 96-2p mandates that

When the determination or decision [of the ALJ] is not fully favorable, e.g., is a denial . . .

the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

*Titles II & XVI: Giving Controlling Weight to Treating Source Med. Opinions*, SSR 96-2P (S.S.A. July 2, 1996); *see also* 20 C.F.R. § 404.1527(d)(2). In this instance, the evaluation of Dr. Berman's treating source opinion is too cursory and conclusory.

Curley's admission that she cares for her grandson daily does not contradict Dr. Berman's conclusions. As this court has found in the past, "[o]ne can at least minimally take care of a grandchild, attend church, perform housework, shop and go to a pool even if . . . she can sit for no more than 30 minutes continuously, stand for no more than one hour continuously, lift less than 10 pounds only occasionally, and only sit for two hours and stand/walk for a total of four hours in an 8 hour workday." *Santana*, 2016 WL 7428223, at *5. Further, the finding that plaintiff has had "a

positive response to conservative treatment" is supported by a citation to a single progress note from High Point dated February 28, 2012. (TR at 934.) While it is true that the note states Curley was "[d]oing well" and that she felt "the medications are working well," the note simultaneously relates that plaintiff "[c]ontinues to feel mood swings and irritability." *Id.* That single medical progress note from a medical record of more than 750 pages cannot fairly be said to constitute substantial evidence supporting a finding that Curley responded positively to conservative treatment.

Further, although the ALJ determined that Dr. Berman's opinion was "inconsistent with the evidence," 20 C.F.R. § 404.1527(c)(4), the ALJ did not undertake a thorough evaluation of the factors laid out in 20 C.F.R. § 404.1527(c) when she discounted the treating source's opinion. *See McNelley v. Colvin,* No. 14-cv-14342, 2015 WL 3454721, at *4 (D. Mass. May 29, 2015) ("If the treating physician's opinion is inconsistent with other evidence in the record, the conflict is for the ALJ, not the court, to resolve. The ALJ's decision must nevertheless contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record.") (internal quotation marks and citations omitted). While "[t]he regulations do not require an ALJ to expressly state how each factor was considered," the ALJ's "decision [must] provide 'good reasons' for the weight given to a treating source opinion." *Bourinot v. Colvin*, 95 F. Supp.3d 161, 177 (D. Mass. 2015) (citing 20 C.F.R. §§ 416.927(c)(2) and 404.1527(c)(2)). Here, the ALJ's decision was not supported by good reasons.

The ALJ's assessment of Dr. Berman's treating source opinion was inadequate and lacked sufficient justification. The case should, therefore, be remanded for further consideration of this medical evidence.

5. Rejecting Treating Psychiatrist's[17] Opinion.

The ALJ accorded little weight to the opinion of Curley's treating psychiatrist; ALJ Carter found it to be inconsistent with other substantial evidence in the case and not well-supported by the medical evidence. (TR at 19-20.) The opinion that plaintiff had marked limitations was found to be at odds with Curley's reports that she had made notable improvement with sobriety and medication compliance. (TR at 20.) Further, ALJ Carter highlighted the doctor's comment that her opinion "was based on the claimant's own report of her symptoms, as she frequently missed appointments, leaving little opportunity for psychiatrist (sic) to professionally and objectively evaluate the symptoms." *Id.*

As a result of her chronic absenteeism and tardiness, Curley had met with the therapist only four times, and with the psychiatrist only once. (TR at 1054-55.) With no treatment history on which to rely, the psychiatrist essentially eschewed rendering an expert opinion. In these circumstances, it was well within the ALJ's discretion to afford this "expert opinion" little weight. *See, e.g.*, *Murphy v. Colvin*, No. CV 15-11548-GAO, 2016 WL 5402184, at *13 (D. Mass. Sept. 27, 2016) ("According to the record, Dr. Burke saw Murphy only once. . . . As a result, Dr. Burke's consulting opinion lacked the unique depth and perspective which warrants the assignation of greater weight to his opinion. Accordingly, ALJ Evans was not constrained by the 'Treating Physician Rule' and properly determined what weight to attribute Dr. Burke's opinion based on his analysis of the record as a whole. *See* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4).").

---

[17] Again, this physician's name is illegible. *See* n. 13.

B. Step 5/Non-Disability Findings.

The errors made with respect to the medical opinions undermine the validity of the ALJ's findings at Step 5 and the ultimate conclusion Curley was not disabled. These findings must be vacated.

## V. CONCLUSION AND RECOMMENDATION.

For all the reasons stated, I RECOMMEND that the Motion To Reverse (#15) be GRANTED to the extent that the Commissioner's finding of not disabled be VACATED and the case be REMANDED for further consideration as set forth in this Report.[18] I FURTHER RECOMMEND that Defendant's Motion To Affirm The Commissioner's Decision (#19) be DENIED.


/s/ M. Page Kelley
M. Page Kelley
May 26, 2017                                    United States Magistrate Judge

---

[18] This matter has now been considered twice by the same ALJ. The Commissioner may consider having the case reassigned to a new ALJ upon remand.